PATRICIA L. ROGERS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rogers v. Commissioner
Docket No. 13498-79.
United States Tax Court
T.C. Memo 1982-578; 1982 Tax Ct. Memo LEXIS 171; 44 T.C.M. (CCH) 1312; T.C.M. (RIA) 82578; September 30, 1982. Richard B. Sherman and Arthur Pelikow, for the petitioner. Julius A. Jove, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge:* Respondent determined a deficiency of $384 in petitioner's Federal income tax for 1977. After concessions by the parties the sole issue remaining for our decision is whether petitioner is entitled to a home office deduction under section 280A, [1] I.R.C. 1954. *173 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Patricia L. Rogers (petitioner) resided in New York City, New York, at the time she filed her petition herein. Her federal income tax return for 1977 was filed with the Brookhaven Service Center at Holtsville, New York. During taxable year 1977, petitioner was a concert bassoonist with the Metropolitan Opera Association, Inc. (hereinafter Met) at Lincoln Center, New York City. Petitioner joined the Met in December of 1976. Before joining the Met, she was a student and part-time professional musician for 6 years. Petitioner, as a member of the Metropolitan Opera Orchestra[2] was covered by the terms of union contracts between Local 802, American Federation of Musicians (of which petitioner was a member) and the Met. During 1977 she received compensation from the Met in the amount of $25,390.34. She was compensated by the Met for the following periods: (a) three continuous pre-season rehearsal weeks; (b) the regular *174 New York season whose duration was for no less than 24 weeks; (c) 49 tour days (of approximately 7 weeks). In addition to her compensation, petitioner was reimbursed $1,715 for per diem expenses; (d) 2 weeks of performances in the New York City parks; (e) 5 weeks' vacation; and (f) 5 weeks' supplemental unemployment benefits. During the pre-season rehearsal period, the musicians would rehearse twice a day. The first rehearsal would begin at 10:30 a.m. and end at 1:15 p.m. and the second would begin at 2:00 p.m. and end at 4:45 p.m. This rehearsal schedule continued for 3 weeks, 5 days a week. During the New York season, petitioner was required to perform five operatic performances per week. [3] The running time for each performance could vary from 1 hour and 36 minutes to 4 hours and 55 minutes. Almost all performances during the New York season began at 8 p.m. and, depending upon the opera, ended at around 11 p.m. Saturday performances began at about 2 p.m. There was no contractual requirement that the musicians arrive prior to the start of the performance. However most did so as to "warm up or tune up." Performances consumed 15 to 16 hours per week. All New York *175 City performances (other than those in the parks) were at Lincoln Center. In addition to performing, during the New York Season the orchestra musicians were required to rehearse together as a unit. As a member of the wind section, petitioner was required to participate in these rehearsals at the Metropolitan Opera House at Lincoln Center approximately 10 or 11 hours per week. The orchestra rehearsals were either at a rehearsal room in C level or "in the pit", where performances took place. Thus, during the New York season a member of the wind section would spend approximately 26 hours per week at the Met facility at Lincoln Center playing and rehearsing. In addition, the three weeks of pre-season rehearsals, also at Lincoln Center, consumed about 27 1/2 hours per week. During the 49 tour days in 1977, the musicians generally did not rehearse together as a unit. While on tour, the orchestra performed at night only and during the day the musicians were free to spend their time as they wished. Immediately following 2 weeks of performances in the park, the musicians received a 5-week vacation. *176 During this period, the musicians were not obligated in any way to the Met and were again totally free to do as they wished, including accepting independent employment, without any effect on their compensation. This contrasted with the supplemental unemployment benefits period during which time if a musician worked independently, the supplemental unemployment benefits to be received as compensation would be reduced. During the taxable year 1977, petitioner toured with the Cincinnati Symphony Orchestra for 14 days and received compensation in the amount of $1,017.38 for her services. As a professional musician, petitioner was required to practice numerous hours in order to maintain, refine, and perfect her skill. Petitioner practices the opera in current production as well as the one in preparation. She begins her individual practice with scales and warm-up exercises. She spends considerable time on difficult technical passages practicing those passages of the opera over and over. Practices at the Met were of the entire 93-piece orchestra, differing from a performance principally due to the absence of an audience. Petitioner's parts had to be perfected prior to a rehearsal *177 or performance, since every error can be detected by her colleagues and her conductor. An error can distract other members of the orchestra, and has the potential to disrupt the entire orchestra. The Metropolitan Opera House at Lincoln Center does not have private studios for practice on an individual basis by the 93 members of the orchestra. Neither did the Met otherwise provide to petitioner a facility for private practice. Orchestra employees were expected to practice individually off the premises, which practice was necessary as a practical matter in order for petitioner to carry out her obligations to the Met. Such off-premises practice, while a practical necessity for the orchestra employees, was not requested by the employer and was not a requirement or condition of employment. The musicians (including petitioner) were not required to report to the Met on their practice at home. By contrast, missing a rehearsal or a performance was investigated and usually would result in a loss of pay unless there was a legitimate reason for the absence. During 1977 petitioner moved from one apartment to another. From January 1, 1977 to June 30, 1977, petitioner shared a two room *178 apartment in New York City. Petitioner paid $150 of the $300 rent and allocated a portion of one of the rooms for her studio. The room was 20 feet by 12 feet of which an area of 8 feet 4 inches by 6 feet, 20 percent of the room, was used by petitioner exclusively as her studio. For the balance of 1977, petitioner resided in a one room apartment located in New York City. The room had a total square footage of approximately 50 square feet of which 20 percent was used by petitioner exclusively as her studio. The studios in both apartments were separate and distinct parts of larger rooms although there were no physical barriers separating one area from another. Only items relating to her music study and practice were placed in the area allocated exclusively for her trade or business and no social functions occurred there. The exclusive area or studio contained a desk, [4] chair, cabinet, storage chest, lamp, two bookshelves, stereo, recording equipment, tapes, music tools, opera scores, books, music stand, bassoon, and bassoon stand. [5]
*179 Her work in the studio included continuous practice of her musical skills, repair of her instruments, review of musical scores and rehearsal of her numerous operatic numbers. In addition to the numerous hours of practice required by any musician, petitioner's professional work included reed making, a very important aspect of successful bassoon playing. It would take petitioner between 2 and 3 hours to make a single reed and she made five or six per week. She kept all her reed making tools in her studio and completed all the work there. While in New York, petitioner worked in her studio approximately 30 hours per week. Petitioner deducted $624 on her 1977 return for her home office, her studio. This amount was computed as follows: 6 months
Office in Home
of rent
(20 percent of rent)
First Apartment
$ 900
$180
Jan. 1, 1977 to June 30, 1977
Second Apartment
$2,200
$444
July 1, 1977 to December 31,
1977
$3,100
$624
OPINION Section 280A limits the deductions for expenses in the home for taxable years beginning after December 31, 1975. [6]Section 280A provides generally that "no deduction * * * shall be allowed with respect to the use of *180 a dwelling unit which is used by the taxpayers during the taxable year as a residence." [7]Section 280A(c)(1), as recently amended, sets forth an exception to this general disallowance [8] by providing that: (1) Certain business use.--Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis-- (A) [as] the principal place of business for any trade or business of the taxpayer, [9]
*181 (B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or (C) in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business. In the case of an employee, the preceding sentence shall apply only if the exclusive use referred to in the preceding sentence is for the convenience of his employer. However, for a use described in section 280A(c)(1) a limitation on the deductions is set forth in section 280A(c)(5) which provides: * * * deductions allowed under this chapter for the taxable year by reason of being attributed to such use shall not exceed the excess of-- (A) the gross income derived from such use for the taxable year, over (B) the deductions allocable to such use which are allowable under this chapter for the taxable year whether or not such unit (or portion thereof) was so used. Respondent contends that petitioner has failed to show that she satisfied one of the three prongs of section 280A(c)(1); that is, she failed to show that her studio was her principal place of business, that her *182 studio was a place of business used by patients, clients, or customers in meeting with petitioner in the normal course of her trade or business or that her studio was a separate structure not attached to the dwelling unit used in connection with her trade or business. In addition, respondent contends that petitioner has failed to show that she "satisfied the requirements of section 280A(c)(5)." Petitioner contends that her studio was her principal place of business thereby satisfying section 280A(c)(1)(A), the first prong of section 280A(c)(1), and that she is not limited by section 280A(c)(5) since the gross income derived from the business use of her principal place of business far exceeds the deductions attributable thereto. Petitioner was a concert musician during the taxable year 1977. In addition to performing with the Metropolitan Opera at Lincoln Center, the New York City parks, and the various cities the Metropolitan performed at while on tour, petitioner performed with the Cincinnati Symphony Orchestra. During 1977 petitioner spent the greater portion of her time in her home studio practicing and reviewing in her efforts to maintain, refine and perfect her skill, and *183 making reeds. Petitioner contends that her principal place of business was the place where she conducted her continuous and unceasing work at her trade or business, the trade or business of a professional musician, and that Lincoln Center, and the facilities in Cincinnati and the tour cities were simply the places where the fruits of her work surfaced. This case is in all essentials similar to and controlled by Drucker v. Commissioner, 79 T.C.     (September 30, 1982). Drucker involved a professional musician who also played in the Met orchestra pursuant to the same contract governing petitioner. In Drucker, a Court reviewed opinion, we held that the petitioner therein was an employee of the Met, and that he was in the trade or business of being an employee of the Met. Accordingly, following the test articulated in Baie v. Commissioner,74 T.C. 105 (1980), we there held that the Lincoln Center was the "focal point" of petitioner's trade or business as an employee of the Met. We recognize that petitioner, in addition to a rigorous practice schedule, also spent substantial time in her home studio making reeds for her instrument. While in this *184 respect hers is a compelling case, we nevertheless believe it is controlled by Drucker v. Commissioner,supra.
The issues presented in this case are fully discussed in the majority and dissenting opinion in Drucker, and no purpose would be served by repeating them here. On the authority of Drucker v. Commissioner,supra, we decide this issue for respondent. Decision will be entered for the respondent.
Footnotes
*. This case was tried before Judge Sheldon v. Ekman who is now deceased. By order of the Chief Judge the case was reassigned to Judge Richard C. Wilbur↩ for disposition. 1. Petitioner claimed $820 as an office in home and depreciation deduction. Respondent disallowed $624 under sec. 280A↩. The balance, $196, is attributable to depreciation for home office furniture. The parties agree that the depreciation on the home office furniture is to be controlled by our determination on the home office issue; however, it petitioner prevails on that issue, the amount available for depreciation will be $27.62.
2. The Metropolitan Opera Orchestra consisted of 93 regular musicians.↩
3. Since petitioner was a first player, she did not play every performance.↩
4. Petitioner purchased a new stereo system and desk in November 1977, replacing the similar but older ones. ↩
5. The only photographs in the record are of the second apartment and most of the testimony relates to this apartment. Therefore, we find that the first apartment contained an arrangement similar to the second apartment. In any event, the first apartment had, like the second apartment, an area for exclusive use for petitioner's business.↩
6. Sec. 601, Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1569-1572. ↩
7. Sec. 208A(b) provides that "subsection (a) shall not apply to any deduction allowable to the taxpayer without regard to its connection with his trade or business (or with his income producing activity)." ↩
8. Other exceptions to the general disallowance provisions of sec. 280A(a) are set forth in sec. 280A(c)(2), (3), and (4)↩.
9. As we recently said in Green v. Commissioner,78 T.C. 428, 431 n. 3 (1982), "Sec. 280A↩ was amended by Pub. L. 97-119, as signed into law Dec. 29, 1981. Prior to amendment, subsec. (c)(1)(A) read '(A) as the taxpayer's principal place of business.' This amendment applies retroactively to tax years beginning after Dec. 31, 1975, except that, for tax years after Dec. 31, 1975, and before Jan. 1, 1980, the amendment applies 'only to taxable years for which, on the date of the enactment of this Act, the making of a refund, or the assessment of a deficiency, was not barred by law or any rule of law.' Sec. 113(e)."